UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Impac Mortgage Holdings Inc., et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>Houston Casualty Company, et al.,<br><br>Defendants. | CASE NO. SACV 11-1845-JST (JCGx)<br><br>**ORDER (1) DENYING DEFENDANT THOSE CERTAIN UNDERWRITERS AT LLOYDS, LONDON'S MOTION FOR SUMMARY JUDGMENT; (2) GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING COVERAGE FOR MAIDEN LANE'S LETTER AND CITIGROUP'S ACTION AS TO DEFENDANT THOSE CERTAIN UNDERWRITERS AT LLOYDS, LONDON; AND (3) GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING COVERAGE FOR FEDERAL HOME LOAN BANK OF BOSTON'S ACTION AS TO DEFENDANT THOSE CERTAIN UNDERWRITERS AT LLOYDS, LONDON (DOCS. 31, 49, 87, 94)** |

Before the Court are cross-motions for partial summary judgment and for summary judgment filed by Plaintiffs (collectively, "Impac") and Defendant Those Certain Underwriters at Lloyds, London ("Lloyds"). (Impac's MPSJ re. ML/Citi, Doc. 31, 32; Impac's MPSJ re. FHLBB, Doc. 49, 50; Lloyds' MSJ, Docs. 87, 88, 94.) Each party seeks summary judgment in its favor regarding the duty to defend Impac in four underlying actions (three lawsuits and one demand letter).[1] Having considered the briefing and supporting documentation submitted by the parties, heard oral argument, and taken the matters under submission, the Court GRANTS Impac's motions as to Lloyds and DENIES Lloyds' motion.

## I.  BACKGROUND

This dispute arises out of two sets of insurance policies, and the scope of Impac's coverage under those policies. Specifically, it involves "Professional Services Liability" policies issued by Lloyds for the periods September 1, 2009 – September 1, 2010 and September 1, 2010 – September 1, 2011 ("Policies"). (Morrison Decl. in Supp. of MPSJ re. ML/Citi ("First Morrison Decl.") Ex. 5 ("SUA 12084"), Doc. 38-5; Ex. 3 ("SUA 12325"), Doc. 38-3.) Impac argues that the terms of the Policies obligate Lloyds to defend it in the four underlying claims, all of which arise out of Impac's mortgage-backed securities business.

### A.  Impac's Mortgage Securitization Business

Until mid-2007, Impac funded, sold, and securitized non-conforming residential mortgages. (Houston's Appx. in Supp. of MPSJ Ex. A "Impac 2007 10-K" at 12-13, Doc. 82-1.)[2]

---

[1] Impac has filed two motions for partial summary judgment, one as to two of the underlying actions, and one as to the third underlying action. Impac's motions do not address the fourth underlying action, *Mass. Mutual Life Ins. Co. v. Impac*, "due to the dismissal of MassMutual's claims." (Opp'n to Lloyds' MSJ at 4, Doc. 106; *see also* Lloyds' Request for Judicial Notice Ex. B, C, Docs. 108-2, 108-3.)

[2] Impac's 2007 10-K was filed by Houston Casualty Company in support of its Motion for Summary Judgment. Under Federal Rule of Evidence 201, the Court can, *sua sponte*, take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Moreover, a district court "may presume that public records are authentic and trustworthy." *Gilbrook v. City of Westminster*, 177 F.3d 839, 858 (9th Cir. 1999). This Court therefore takes judicial notice of Impac's 2007 10-K.

Because the mortgages that Impac funded were non-conforming, Impac was unable to sell them to Fannie Mae or Freddie Mac.[4] (*Id*. at 13) Instead, Impac primarily obtained the money it used to fund its mortgages through securitizing mortgages. (*Id.* at 3.)

One Impac company, Impac Funding Corporation ("IFC"), was the originator of the mortgages, deciding which mortgages were appropriate to issue to residential borrowers. (First Morrison Decl. Ex. 29 ("Impac Series 2007-3 Prospectus Supplement") at 1258, Doc. 46-1.) It was also the sponsor of the mortgages, deciding what mortgages to send to a trust for eventual securitization. (*Id*. at 1216, 1237.) Another Impac company, Impac Secured Assets Corporation ("ISAC"), would buy the mortgages that IFC deemed appropriate for securitization and deposit them in a trust ("Trust") operated by Deutsche Bank, an independent trustee. (*Id*. at 1216, 1270.)

The Trust—defined in the Trust prospectus as the "Issuing Entity"—would in turn issue certificates ("Certificates") that "in the aggregate represent[ed] the entire beneficial ownership interest in the Issuing Entity." (*Id*. at 1216, 1219.) "Distributions of interest and/or principal" on the Certificates were made solely "from payments received from the Issuing Entity." (*Id*. at 1219.) The Certificates were issued to an underwriter, who then sold them to investors. (*Id*. at 1341, Doc. 47-1.)

### B. The Policies

The Policies cover "**Loss** in excess of the Retention . . . which the **Insured** shall become legally obligated to pay as a result of "any **Claim** first made against the **Insured** during the **Policy Period** for a **Wrongful Act** . . . ." (SUA 12325 at 164, SUA 12084 at 228.)

All the Impac Plaintiffs in this case are named insureds under the policy, and are thus considered "Insureds." (SUA 12325 at 163, 165, 199; SUA 12084 at 226, 229, 256.) "Wrongful Act" means "any actual or alleged negligent act, negligent error or negligent omission committed

---

[3] All citations are to exhibit page numbers.

[4] "Some of the principal differences between mortgages purchased by Fannie Mae and Freddie Mac and the [non-conforming mortgages were]: credit (FICO score) and income histories of the mortgagor; underwriting guidelines for debt and income ratios; loan to value ratios accepted; documentation required for approval of the mortgagor; and loan balances in excess of maximum Fannie Mae and Freddie Mac lending limits." (Impac 2007 10-K at 13.)

by the **Insured** solely in the performance of or failure to perform professional services for others in the **Insured's** Profession at stated in Item 1.A of the Declarations." (SUA 12325 at 165, SUA 12084 at 229.)  The "Insured's Profession as stated in Item 1.A of the Declarations" of both Policies is "Mortgage Banker/Mortgage Broker."  (SUA 12325 at 163, SUA 12084 at 225.)

The Policies exclude claims "based upon or directly or indirectly arising out of or resulting from the depreciation (or the failure to appreciate) in value of any investment transaction, including real property, securities, commodities, currencies, options and futures, or any actual or alleged representation, advice, guarantee or warranty provided by or [sic] behalf of an Insured with regard to the performance of any such investment." (SUA 12325 at 173, SUA 12084 at 237.)

### C. Underlying Claims

#### 1. Federal Home Loan Bank of Boston Action

In April 2011, the Federal Home Loan Bank of Boston ("FHLBB") filed a complaint against Impac in the Commonwealth of Massachusetts Superior Court ("FHLBB's Complaint"). (Morrison Decl. in Supp. of Impac's MPSJ Re. FHLBB Action ("Second Morrison Decl.") Ex. 12 ("FHLBB Compl."), Docs. 58-1, 59-1, 60-1, 61-1.  FHLBB's Complaint identifies IMH Assets Corp., Impac Secured Assets Corp., Impac Funding Corporation, and Impac Mortgage Holdings, Inc. as defendants in an "action aris[ing] from the sale . . . of over $5.9 billion in Private Label Mortgage-Backed Securities [("Certificates")] . . . . [which are] 'securities' within the meaning of the Massachusetts Uniform Securities Act. . . ." (*Id*. at 346.)  The complaint alleges violations of Massachusetts securities and "unfair or deceptive acts" statutes, as well as negligent misrepresentation, arising from alleged "false and misleading statements of material fact and omissions of material facts" in the Certificates' Offering Documents and from "material misrepresentations" made "in the course of [defendants'] business dealings" with FHLBB. (FHLBB Compl. at 651, 656, 660, 672, 677, 681-82, 687, 690-91.)

#### 2. Maiden Lane Letter

On April 20, 2010, the Federal Reserve Bank of New York ("NY Fed") and Maiden Lane II (an entity formed by the NY Fed to facilitate American International Group's ("AIG's") restructuring) sent a letter to Impac ("Maiden Lane's Letter") regarding a "dispute concerning the

4

payment priority provisions in four IMPAC securities offerings . . . (the 'IMSA Securities')" purchased by AIG. (First Morrison Decl. Ex. 13 ("ML Letter") at 1113-14, Doc. 43-2.) According to the letter, AIG had relied upon the prospectus supplements of the four securities, which represented that "principal would be paid pro rata to all Class A certificateholders if and when the Certificate Principal Balances of the subordinated tranches were reduced to zero. . . ." (*Id*. at 1114.) Approximately one year after Maiden Lane II purchased the four securities from AIG, it discovered that the securities' Pooling and Service Agreements (PSAs) actually stated that principal would be paid "sequentially, to the Class A-2A, Class A-2B and Class A-2C Certificates, in that order. . . ." (*Id*.) Maiden Lane's Letter alleges that as a result of this clerical error in the PSAs, "the senior IMSA Securities owned by [Maiden Lane II] are now shut out of principal payments until other Class A tranches are paid in full." (*Id*. at 1115.) The letter states that Maiden Lane II has suffered and continues to suffer damages, and that it is "entitled to pursue appropriate rescissionary damage remedies under Section 11 of the Securities Act of 1933," which could amount to $668 million. (*Id*.)

### 3. Citigroup Action

On May 25, 2011, Citigroup Global Markets Inc. ("Citigroup") filed a complaint against Impac in the United States District Court for the Central District of California ("Citigroup's Complaint"). (First Morrison Decl. Ex. 14 ("Citigroup Compl."), Doc. 43-3.) Citigroup's Complaint involves the mortgage-backed trust IMSA 2007-3, one of the four securities at issue in the Letter. (ML Letter at 1113, Citigroup Compl. at 1123.) Citigroup's Complaint alleges that in March and April of 2010, Citigroup purchased Class A1-A certificates in IMSA 2007-3, relying on the Prospectus Supplement and other documents filed with the SEC, which referred to a PSA stating that Class A1-A certificates would be paid certain distributions ahead of other Class A certificates. (*Id*. 1123-24.) Citigroup's Complaint further alleges that in late April 2010, after Citigroup had purchased the certificates, a new SEC Form 8-K/A was filed with the SEC, stating that the earlier PSA had been "inadvertently filed," and filing a new PSA. (*Id*. at 1125.) According to the terms of the new PSA, distributions would be paid to all Class A certificates concurrently and pro rata. (*Id*.) Citigroup alleges that this change caused its certificates to lose

5

millions of dollars in market value. (*Id*. at 1126.) Citigroup's Complaint asserts causes of action for violation of Sections 18 and 20 of the Securities Act of 1934 and for negligent misrepresentation, and seeks damages, attorney's fees, and costs. (*Id*. at 1127-31.)

### 4. MassMutual Action

On May 6, 2011, Massachusetts Mutual Life Insurance Co. ("MassMutual") filed a complaint against Impac in the United States District Court for the District of Massachusetts ("MassMutual's Complaint"). (Morrison Decl. in Supp. of Opp'n to Lloyds' MSJ ("Third Morrison Decl.") Ex. 15 ("MassMutual Compl."), Doc. 112-5.) MassMutual's Complaint arises out of its purchase of $16.7 million in certificates in the mortgage-backed trusts Impac Secured Assets Corp. Series 2206-1 and Impac Secured Assets Corp. Series 2006-4. (*Id*. at 1142 ¶ 34.) MassMutual alleges that the mortgages backing the certificates "deviated substantially from what was represented" to it, and that the certificates "now qualify as junk" because "over 28% of the loans backing the [certificates] have . . . defaulted, . . . been foreclosed upon, or are delinquent." (*Id*. at 1134 ¶¶ 6-7.) MassMutual's Complaint alleges that Impac violated Massachusetts securities laws by selling the securities "by means of false and misleading statements of material fact" that "misrepresented the underwriting standards that applied to the mortgage loans backing the Certificates, misrepresented the LTV and appraisal information for the loans, and misrepresented the owner-occupancy information for the loans." (*Id*. at 1170 ¶¶ 117-18.) MassMutual seeks to rescind its purchase of the certificates and/or recover damages. (*Id*. at 1134 ¶ 7.)

### D. The Parties' Coverage Dispute

On June 25, 2010, Impac sent Lloyds a copy of Maiden Lane's Letter. (First Morrison Decl. Ex. 20, Doc. 44-1.) On July 15, 2010, Lloyds responded, denying coverage for the claims asserted in the Letter. (First Morrison Decl. Ex. 24, Doc. 44-5.) On May 17, 2011, Impac notified Lloyds of FHLBB's Complaint. (First Morrison Decl. ¶ 20, Doc. 37; Second Morrison Decl. Ex. 18, Doc. 61-7.) On June 7, 2011, Lloyds sent a letter acknowledging receipt of that notice and consenting to Impac incurring defense costs in connection with the FHLBB action, but acknowledging neither a duty to defend nor coverage for the action. (Second Morrison Decl. Ex.

19, Doc. 61-8). On June 1, 2011, Impac notified Lloyds of Citigroup's Complaint. (First Morrison Decl. Ex. 27, Doc. 45-1.) On June 7, 2011, Lloyds sent a letter acknowledging receipt of that notice and consenting to Impac incurring defense costs in connection with the Citigroup action, but acknowledging neither a duty to defend nor coverage for the action. (First Morrison Decl. Ex. 28, Doc. 45-2.)[5]

On September 7, 2011, Impac filed this action against Lloyds and co-defendant Houston Casualty Company in Orange County Superior Court. (Notice of Removal Ex. A, Doc. 1.) Lloyds filed a notice of removal on November 30, 2011 on the basis of diversity jurisdiction. (Notice of Removal.) Immediately prior to filing the notice of removal, Lloyds filed an answer to the complaint, in which it asserted that all three underlying claims were beyond the scope of the Policies' coverage. (Notice of Removal Ex. A at 45-51.)

Impac filed its FAC on March 21, 2012, seeking: "(1) declaratory relief as to the rights and obligations of all parties . . . with respect to three separate law suits alleging misrepresentations and omissions in the sale of approximately one-hundred and twenty million dollars of mortgage backed securities (identified . . . as MassMutual's Action, Federal Home Loan Bank of Boston's Action and Citigroup's Action) and a written demand letter (identified below as Maiden Lane's Letter) which bears a relationship to one of those lawsuits (Citigroup's Action), each of which names one [or] more of the Plaintiffs in this action as a defendant or responsible party, under four policies of insurance issued by Defendants to or for the benefit of Plaintiffs; and (2) recovery of policy benefits from the Defendants under policies of insurance issued by the Defendants to or for the benefit of Plaintiffs." (FAC ¶ 10.)

---

[5] Neither party has submitted any evidence regarding when Impac gave notice to Lloyds of MassMutual's Complaint, and how Lloyds responded to that notice. In its First Amended Complaint ("FAC"), Impac alleges that it gave notice to Lloyds of MassMutual's Complaint in May 2011, and that Lloyds responded in June 2011, agreeing to Impac incurring defense costs. (FAC ¶¶ 58-60, Doc. 22.) Impac alleges that Lloyds subsequently failed to acknowledge a duty to defend or advance costs, and that in answer to Impac's initial complaint in this action, Lloyds stated that MassMutual's Complaint was outside the scope of the Policies' coverage. (*Id*. ¶¶ 60-61.)

## II. LEGAL STANDARD

### A. Motion for Summary Judgment

In deciding a motion for summary judgment, courts must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is proper "if the [moving party] shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the non-movant's favor, and an issue is "material" when its resolution might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citation and quotation marks omitted). The burden then shifts to the non-moving party to "cit[e] to particular parts of materials in the record" supporting its assertion that a fact is "genuinely disputed." Fed. R. Civ. P. 56(c)(1); *see also In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) ("non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor").

### B. The Duty to Defend Under California Law

The Policies state that Lloyds "shall have the right and duty to defend any Claim against the Insured to which this insurance applies, even if any of the allegations of the Claim are groundless, false or fraudulent." (SUA 12325 at 164, SUA 12084 at 228.) Under California law, an insurer "owes a broad duty to defend its insured" against any suit "which *potentially* seeks damages within the coverage of the policy." *Ortega Rock Quarry v. Golden Eagle Ins. Corp.*, 141 Cal. App. 4th 969, 977 (2006) (citations omitted). "To prevail, the insured must prove the existence of *a potential for coverage*, while the insurer must establish *the absence of any such*

8

*potential*.  In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*." *Montrose Chem. Corp. v. Superior Court*, 6 Cal. 4th 287, 300 (1993).  The duty to defend is determined by "the facts alleged in the complaint" and "facts known to the insurance company at the time of the coverage decision." *Griffin Dewatering Corp. v. N. Ins. Co. of N.Y.*, 176 Cal. App. 4th 172, 197-98 (2009).  "Any doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor." *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1081 (1993).

At the summary judgment stage, "[o]nce a *prima facie* showing is made [by the insured] that the underlying action fell within coverage provisions, an insurer may defeat a motion for summary judgment on the duty to defend only by producing undisputed extrinsic evidence conclusively eliminating the potential for coverage under the policy." *Anthem Elecs., Inc. v. Pac. Emp'r Ins. Co.*, 302 F.3d 1049, 1060 (9th Cir. 2002) (citation omitted).  "Evidence that merely place[s] in dispute whether [the insured's] action would eventually be determined . . . to fall within one or more of the exclusions contained in the polic[y] is insufficient to defeat the insured's right to summary judgment." *Id*. (citations omitted).

### C.  Insurance Policy Interpretation

Under California law, the interpretation of an insurance policy is a question of law. *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 647 (2003); *Waller v. Truck Ins. Exch.*, 11 Cal. 4th 1, 18 (1995).  "While insurance contacts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply . . . Thus, the mutual intention of the parties at the time the contract is formed governs interpretation." *Palmer v. Truck Ins. Exch.*, 21 Cal. 4th 1109, 1115 (quoting *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992), *AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807, 821 (1990)).  In resolving interpretation disputes, the court first "look[s] to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it." *Waller*, 11 Cal. 4th at 18 (citing Cal. Civ. Code § 1638). "In doing so, the court must interpret the language in context, with regard to its intended function in the policy." *Bank of the West*, 2 Cal. 4th at 1265.  "[A]n abstract ambiguity based on a semantically permissible interpretation of a word or phrase cannot create coverage where none

would otherwise exist." *State Farm Gen. Ins. Co. v. JT's Frames, Inc.*, 181 Cal.App.4th 429, 444 (Cal. Ct. App. 2010).  If the terms of the policy are in fact ambiguous, the policy must be interpreted "in the sense in which the promisor believed, at the time of making it, that the promisee understood it." *Bank of the West*, 2 Cal. 4th at 1264-65.  If this does not resolve the ambiguity, the ambiguous language is generally to be construed against the insurer, although "where the policyholder does not suffer from lack of legal sophistication or a relative lack of bargaining power, and where it is clear that an insurance policy was actually negotiated and jointly drafted, [the court] need not go so far in protecting the insured . . . ." *AIU Ins. Co.*, 51 Cal.3d at 822.  Finally, coverage may be limited by exclusionary clauses only to the extent that those clauses are "conspicuous, plain and clear." *Haynes v. Farmers Ins. Exch.*, 32 Cal. 4th 1198, 1204 (2004) (quoting *Steven v. Fidelity & Casualty Co.*, 58 Cal.2d 862, 878 (1962)).  "[I]nsurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured, [whereas] ... exclusionary clauses are interpreted narrowly against the insurer." *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 648 (Cal. 2003).

### III.   DISCUSSION

####   A.  Coverage for "Professional Services for Others"

The parties dispute whether the underlying claims, which relate to Impac's securitization of mortgages, arise out of Impac's "performance of or failure to perform professional services for others."  The Policies define Impac's profession as "mortgage banker/mortgage broker."  (SUA 12325 at 163, SUA 12084 at 225.)  Impac argues the underlying claims arise out of its securitization of mortgages, an activity that is an integral part of the profession of a mortgage banker/mortgage broker.  (Impac's MPSJ re. ML/Citi at 14, Impac's MPSJ re. FLHBB at 13-14, Opp'n to Lloyds' MSJ at 10-13.)

The term "professional" has "long ceased to be connected and restricted exclusively to those so-called learned professions." *Hollingsworth v. Commercial Union Ins. Co.*, 208 Cal. App. 3d 800, 806-7 (1989).  Instead, "professional services" generally include services "arising out of a vocation, calling, occupation or employment involving specialized knowledge, labor, or skill . . . ." *Tradewinds Escrow, Inc. v. Truck Ins. Exch.*, 97 Cal.App.4th 704, 713 (2002).  Applying

1  California law, the Ninth Circuit has defined "professional services" broadly, holding that "[t]o be
2  considered a 'professional service' for insurance purposes, a liability 'must arise out of the special
3  risks inherent in the practice of the profession.'" *PMI Mortg. Ins. Co. v. Am. Int'l Specialty Lines*
4  *Ins. Co.*, 394 F.3d 761, 766 (9th Cir. 2005). *Bank of Cal., N.A. v. W.H. Opie*, 663 F.2d 997 (9th
5  Cir. 1981), involved a mortgage banking corporation sued for violating a loan agreement as to the
6  proper allocation of funds it had borrowed from a bank.[6] The Ninth Circuit rejected the insurer's
7  argument that that suit did not arise out of a "professional service" because there was no
8  "professional-service relationship" between the mortgage banker and the lending bank. *Id*. at 981.
9  Rather, the court held that coverage was "dependent upon the nature of the insured's conduct, not
10 the status of the party harmed" and that "courts must look 'to the act itself' to determine whether
11 the insured's liability was predicated upon the faulty rendition of professional services." *Id*. at 982
12 (internal citations omitted).

13       The undisputed facts support the conclusion that the securitization was a central element
14 in Impac's mortgage banking/brokerage business, and that that suits arising out of mortgage
15 securitizations arise out of "special risks inherent in" the practice of the profession of mortgage
16 banker/broker. *PMI*, 394 F.3d at 766. Impac cites to a policy paper released by the Mortgage
17 Bankers Association, in which it states that "[m]ortgage bankers . . . realize gains (or losses) on
18 the sale of mortgages when loans are pooled and sold to investors in the secondary mortgage
19 market." (Gorman Decl. in Supp. of Impac's MPSJ re. ML/Citi ("First Gorman Decl.") Ex. B at
20 21, Doc. 36-2.) It also cites to a Mortgage Banking Handbook released by the Comptroller of
21 Currency, which states that "[m]ortgage banking generally involves loan originations, purchases,
22 and sales through the secondary mortgage market." (Gorman Decl. in Supp. of Opp'n to Lloyds'
23 MSJ ("Second Gorman Decl.") Ex. K at 66, Doc. 116-2) Impac's 2007 10-K also reflects the
24 intimate connection between the company's mortgage origination business and its mortgage

---

[6] Although *Opie* applies Washington law, the Ninth Circuit cited it with approval in *PMI*, describing the case as containing "[t]he most authoritative construction of the term 'professional services' as used in the malpractice insurance setting." *PMI Mortg. Ins. Co.,* 394 F.3d at 766.

1 securitizations. Because Impac could not sell its non-conforming mortgages to Fannie Mae and
2 Freddie Mac, it was reliant on the funds it obtained through securitizing mortgages to fund those
3 mortgages. (Impac 2007 10-K at 3, 13.)

4 Lloyds does not dispute that mortgage bankers/brokers "engage in the business of buying,
5 selling and securitizing mortgages," but asserts that Impac was not performing "professional
6 services for others" when it "b[ought], s[old] or securitize[d] loans for its own account." (Lloyds'
7 Reply in Supp. of MSJ at 4, Doc. 139.) To support its argument, Lloyds relies on *Johnson v. First
8 State Ins. Co.*, 27 Cal. App. 4th 1079 (1994), in which the California Court of Appeals found that
9 an attorney who performed legal work on his own case had not performed professional services
10 for others. That case, however, is easily distinguishable from the one at hand. A lawyer
11 performing work on his own case works for his own personal benefit; his activities bear no
12 connection to his provision of professional services for others. Impac's mortgage securitizations,
13 on the other hand, were an integral component of its business and were critical to its ability to
14 underwrite non-conforming loans. As such, Impac's actions in securitizing mortgages bore an
15 intimate, necessary connection to its provision of professional services for others. Whether there
16 was a traditional professional-service relationship between Impac and the buyers of its mortgage-
17 backed securities is, per *Opie*, irrelevant.

18 Lloyds also argues, more generally, that "professional services" cannot refer to the act of
19 selling property. It argues that the value conveyed during the sale of property is the property and
20 not the professional's "specialized knowledge, labor, or skill." (Lloyds' Reply in Supp. of MSJ at
21 7) (quoting *Tradewinds*, 97 Cal.App.4th at 713). However, as *PMI* makes clear, the test of
22 whether a liability arises out of a professional service is not what value was conveyed to the
23 recipient of the service. Rather, it is whether the liability arises out of a risk inherent in the
24 practice of the insured's profession. By conceding that mortgage bankers/brokers engage in
25 mortgage securitizations, Lloyds concedes that liability arising out of mortgage securitization is a
26 risk inherent in the practice of the profession of mortgage banker/broker. The Court therefore
27 concludes that the underlying claims, which all arise out of Impac's mortgage securitization
28

business, arise out of Impac's "performance of or failure to perform professional services for others."

### B. Exclusion AA

Exclusion AA in the Policies excludes claims that arise out of either (1) "the depreciation (or the failure to appreciate) in value of any investment transaction" or (2) "any actual or alleged representation, advice, guarantee or warranty provided by or on behalf of an Insured with regard to the performance of any such investment." (SUA 12325 at 173, SUA 12084 at 237.)

Coverage may be limited by exclusionary clauses only to the extent that those clauses are "conspicuous, plain and clear." *Haynes v. Farmers Ins. Exch.*, 32 Cal. 4th 1198, 1204 (2004) (quoting *Steven v. Fid. & Cas. Co.*, 58 Cal. 2d 862, 878 (1962)). Further, since the duty to defend applies in this case, Impac need only "prove the existence of a *potential for coverage*, while [Lloyds] must establish *the absence of any such potential.*" *Montrose Chem. Corp. v. Superior Court*, 6 Cal. 4th 287, 300 (1993).

Lloyds cannot establish that either prong of Exclusion AA conspicuously, plainly, and clearly precludes coverage for the underlying claims. As to the first prong of the exclusion, Lloyds argues that the underlying claimants are clearly investors, that their purchases of the mortgage-backed securities are plainly "investment transactions," and that all assert that their investments have depreciated or may depreciate in value. (Lloyds' MSJ at 12.) The term "depreciation" clearly contemplates a decline in value over time. *See, e.g.*, *New York Life Ins. Co. v. Anderson*, 263 F. 527, 529 (2d Cir. 1920) ("[D]epreciation . . . . means, by derivation and common usage, a 'fall in value; reduction of worth.'")

All the underlying claims involve some allegations that are not "based upon or directly arising out of or resulting from" a fall in the securities' worth over time. Maiden Lane alleges that due to the error in the PSAs of the certificates it purchased it "suffered the diversion of over $29 million in principal payments that it should have received." (ML Letter at 1115.) It "calculates that the difference between future cashflows under the pro rata payment of principal . . . and the cashflows under the sequential payment . . . exceeds $70 million." (*Id.*) Citigroup alleges that due to the same clerical error it "has received reduced distributions from the trust" and that "the trust

13

has . . . paid millions of dollars in distributions to Classes A1-B and A1-C that otherwise would have gone only to Class A1-A [the class of certificates Citigroup owned]." (Citigroup Compl. at 1120 ¶¶ 5-6.)

The MassMutual and FHLBB complaints both contain factual allegations implying that the disputed securities were worthless at the time of purchase, or at least worth less than their purchase price. FHLBB's Complaint alleges that Impac failed to follow its stated underwriting criteria for the underlying mortgages, and that "[i]f stated underwriting criteria are not followed, the collateral is not properly appraised, or the creditworthiness of the borrower is not accurately measured, the Certificates are riskier and more likely to result in losses than is apparent from the Offering Documents." (FHLBB Compl. at 348 ¶ 6.) It also alleges that "[p]ursuant to both [FHLBB] policy and applicable regulatory requirements . . . [FHLBB] purchased only senior, triple-A-rated [] tranches . . . . [B]ased on the Offering Documents, [FHLBB] believed it was buying . . . Certificates . . . equivalent, from an investment quality standpoint, to other triple-A-rated investments. Instead, [it] purchased a toxic stew of [securities] backed by doomed mortgage loans." (*Id*. at 349 ¶ 8.) MassMutual's Complaint alleges that the mortgages underlying the securities MassMutual purchased were "issued on the basis of overstated incomes, inflated appraisals, false verifications of employment, and exceptions to underwriting criteria that had no proper justification." (MassMutual Compl. at 1134 ¶ 6.) It further alleges that even given the economic downturn, "[l]oan pools that were properly underwritten and contained loans with the represented characteristics would have experienced substantially fewer payment problems and substantially lower percentages of . . . delinquencies." (*Id*. at 1156 ¶ 71.) These allegations reflect an overpayment at the time of the initial transaction, and suffice to establish that despite the exclusion of claims "based upon or directly arising out of or arising from . . . the depreciation . . . of any investment transaction," there exists a potential for coverage.

As to the second prong of the exclusion, Lloyds argues that all of the underlying claims arise out of "actual or alleged representation[s], advice, guarantee[s] or warrant[ies] provided by or on behalf of an Insured with regard to the performance of" the securities. (Lloyds' MSJ at 11-12.) Exclusionary language must be "interpreted narrowly against the insurer." *MacKinnon v.*

14

*Truck Ins. Exch.*, 31 Cal. 4th at 648. The misrepresentation alleged in Citigroup's Complaint and Maiden Lane's Letter regarded the order in which distributions would be made to the various classes of trust certificate holders. (Citigroup Compl. ¶¶ 23-25, ML Letter at 1113-14.) That alleged misrepresentation relates to the *structure* of the securities, rather than the anticipated value of the assets underlying the securities. Of course, the way a security is structured can affect its value and performance. However, the link between a securities' structure and its performance is not direct enough for an exclusion covering claims arising out of misrepresentations regarding a security's performance to plainly preclude coverage for misrepresentations regarding a security's structure.

The FHLBB and MassMutual complaints both allege that Impac either misrepresented or failed to disclose the quality of the mortgages underlying its securities. (FHLBB Compl. at 660-61 ¶ 814 (alleging "material misstatements and omissions" pertaining to "adherence to the [mortgage] originators' stated underwriting guidelines," "the LTVs of the mortgage loans in the collateral pools of the[] securitizations," and "the enforceability of the mortgages."), MassMutual Compl. at 1170 ¶¶ 117-18 (alleging that the securities' offering materials "misrepresented the underwriting standards that applied to the mortgage loans backing the [securities]" and that Impac "sold the Certificates to MassMutual by means of false and misleading statements of material fact and omissions of material facts necessary to make the statements made not misleading.") Misrepresentations regarding the quality of the mortgages underlying mortgage-backed securities may qualify as misrepresentations regarding a factor affecting those securities' performance. They are not, however, affirmative misrepresentations as to those securities' performance. And the alleged omissions are not misrepresentations at all. As such, Lloyds cannot avoid coverage based on the narrowly construed language of Exclusion AA.

Therefore, the Court finds that the neither prong of Exclusion AA precludes coverage for the underlying claims.

IV. **CONCLUSION**

    For the foregoing reasons, Plaintiffs' motions are GRANTED as to Defendant Lloyds and Lloyds' motion is DENIED.

DATED:  February 26, 2013

_____
UNITED STATES DISTRICT JUDGE